McCaffrey v. State.

(Division B. April 10, 1939. Suggestion of Error Overruled June 5, 1939.)

[187 So. 740. No. 33504.]

E. C. Barlow and Edward L. Womack, both of Brookhaven, for appellant.

**W. D. Conn, Jr.,** Assistant Attorney-General, for the State.

Argued orally by **E. C. Barlow**, for appellant and by **W. D. Conn, Jr.**, for the State.

**Ethridge, P. J.**, delivered the opinion of the court.

The appellant, Nick McCaffrey, was indicted in the Circuit Court of Lincoln County for the murder of R. E. Moak, was tried and convicted of manslaughter, and sentenced to seventeen years in the state penitentiary; from which judgment he appeals to this Court.

It appears that on or about the 24th day of June, 1938, the appellant, Nick McCaffrey, was employed in driving a truck on a road repairing project, in company with other WPA workers, in Supervisors' District No. 4 in Lincoln County. These workers, it appears, assembled on the day the killing occurred, at a point near Arlington church and school, about two and a half miles north of the residence of the deceased, R. E. Moak, for the purpose of getting their trucks, tools and working materials, before going to the point where the work was being performed. Mr. Moak, the deceased, also appeared at this place for some reason. The appellant was in his truck, preparatory to leaving for his work, when Mr. Moak called to him, "Hey, Nicodemus!", and approached his truck. The other workers were proceeding on their way, but in passing the appellant's truck, in which he was sitting, some of them heard Mr. Moak call to him as stated, and saw him go in the direction of the truck; but at the moment saw nothing to attract attention. When the truck in which four of the workers were riding had passed the appellant's truck, some of them

looked back, and exclaimed, "They are fighting!" Seeing Mr. Moak and the appellant engaged in a struggle, they stopped their truck, and went back to them. Just before reaching the spot where they were struggling. Jim McCaffrey, brother of appellant, called to Nick McCaffrey, not to strike Moak any more; and it was testified that he did not again strike the latter. It was testified that no weapons were found on the ground at the place where the fight occurred; that these men saw appellant knock Mr. Moak down, and when they reached the spot they found him trying to rise, and assisted him to do so. His hat had either fallen or been knocked from his head, and his pipe had fallen to the ground. Jim McCaffrey and other men on the truck took Mr. Moak to his home, but before reaching there he became unconscious. A physician was sent for, and finding him still unconscious, took him to a hospital, where he died shortly after noon.

None of the witnesses saw the beginning of the fight, or heard any of the conversation that took place before it started. The only testimony as to what occurred is that of the appellant, given at the trial, and some statements there introduced, which he had made after the fight was over, in regard to the difficulty. It appears that the appellant, after the fight, went on to the point where the road was being repaired, and then decided that the proper course would be to go to a justice of the peace and plead guilty to fighting, since he would no doubt be arrested and tried for it. He accordingly went to a justice of the peace, to whom he stated that he had engaged in a fight with Mr. Moak, and desired to plead guilty, but the justice of the peace advised him that he could not accept the plea of guilty without a charge being preferred, and that the appellant could not prefer a charge against himself. He also asked the appellant who "whipped" in the fight, and the appellant stated that neither did—that they were separated. He inquired as to the nature of the fight, to which appellant

replied that he gave him ''all he had,'' and made some movement indicating his feet. At that time the appellant did not know anything of Mr. Moak's condition. He went to the constable of the district, a relative by marriage, and had him prepare a charge of fighting against him, plead guilty thereto, and was fined $2 and costs; then returned to his work.

As stated, the condition of the deceased was desperate, and he died shortly after being removed to the hospital. The sheriff of the county, accompanied by his deputies, arrested the appellant, but did not tell him that Mr. Moak was dead. They testified to a statement by the appellant to them, to the effect that when they said to him that he must have hit Mr. Moak very hard—that he was in a serious condition—appellant stated that he gave him all he had; and further, that he ''stomped the soles of his shoes off'' on him.

The appellant was taken to the jail, where the deputy sheriffs and the district attorney interviewed him. He stated that he only struck Moak with his fists, which the district attorney disputed, branding the statement as false in vigorous language. The shoes worn by appellant at the time of his arrest and incarceration, were in good condition—they were neither soleless nor were the soles dilapidated; as stated by some of the witnesses, they only needed polishing.

Dr. Arrington was called to attend Mr. Moak at the hospital; he testified that his face was badly bruised and swollen, that over one of his eyes was a wound where the skin was broken, and which was bloody; that there were some bruises on the head, which the doctor thought were not made by the fist, but by some blunt instrument. The physician testified, on a habeas corpus trial, that in his opinion the death was caused by a basal fracture of the skull where there was a bruise. After the indictment, and before the trial, the district attorney and the wife and children of the deceased applied to the court for an autopsy, to determine the nature and character of

the injuries, and the cause of death, so far as might be done. This autopsy was performed by Dr. Arrington, who found there was no fracture of the skull; but that inside of the skull, in the brain, there was a blood clot of considerable size, caused by a lesion hemorrhage in the brain. This autopsy was performed some sixty or ninety days after the death of the deceased.

The state proved by some witnesses, over objection, that the appellant carried tools in the back of his truck; but the witnesses who were at the scene of the difficulty immediately after it started, stated that there were no tools on the ground, or at the scene of the fight.

The appellant's testimony was to the effect that Moak approached him as he sat in his truck, ready to start, and he turned, placing his feet in the door of the truck, when Moak accosted him about an alleged statement which he claimed the appellant had made, to the effect that Moak had been arrested in connection with a car wreck, with some woman in the car, while driving in a reckless manner. Moak asked the appellant why he made such a statement, and the latter said he knew nothing of it; whereupon Moak called him a "damned liar," and started to pull him out of the truck. The appellant kicked him, got out of the truck, and they clinched, then broke the clinch, and appellant knocked Mr. Moak down with his fist; he had no weapons of any kind, at the time.

After his arrest the appellant was asked by the sheriff and his deputies as to the cause of the difficulty; and he stated that it was caused by a charge made against appellant before a justice of the peace, accusing appellant of stealing a car. The justice of the peace before whom the charge was made was introduced to show that such a charge had been preferred, but had been dismissed for want of prosecution; that Mr. Moak had some connection with the charge, but that the witness relied upon to testify did not appear at court, and the charge was dismissed in consequence.

The defendant objected to the introduction of the justice of the peace and his docket, to show such charge, testifying that at the time he did not know that Mr. Moak had been instrumental in preferring the charge; denied making the statements, alleged that they had been friends —and were friends at the time the charges were preferred against him.

The appellant was a man 33 years of age. At the time of his arrest his fists were not bruised; and Dr. Arrington testified that he did not think a blow of the kind inflicted on the deceased could be caused by striking with the fist, but that if it was so caused, the fist would be bruised, or possibly the knuckles or fingers would be broken. The deceased was a man of about 55, very heavy and fleshy, and had high blood pressure.

At the time of the difficulty the deceased had with him his horse, a stallion; and when the fight began there was some evidence to the effect that the horse reared and got loose from the owner, the appellant testifying that the horse's foot passed between his face and that of the deceased—he did not know whether or not it struck him, or words to that effect.

At the time of his death Mr. Moak was a deputy sheriff, but was not exercising any of the functions of his office. The appellant testified that in the race for constable in that district, the deceased was a candidate against the former's brother-in-law, and that he had voted for Mr. Moak against his brother-in-law.

It does not appear that in making a motion in court for an autopsy on the body of deceased, any notice thereof was given to the appellant, nor that he was asked to have a representative there. A motion was made, after the autopsy, by the defendant, requesting that the parties connected with the autopsy confer with the defendant and his attorneys, disclosing to them the condition revealed thereby.

It appears that a physician was requested by the appellant and his counsel to attend the autopsy; that he

went near the cemetery where the body was being exhumed, but was stopped by someone claiming to represent the sheriff, who refused to permit him to attend the autopsy, and see what was being done. It is contended in the argument that the defendant requested the court to permit his attorney, and a physician to be selected by the defendant, to attend the autopsy. A motion was filed to require the physician and those present to disclose to the defendant the conditions disclosed by the autopsy; it is stated that the defendant is informed and advised, and believes that on Sunday, September 18, 1938, the body of the deceased was exhumed, and an autopsy performed thereon by Dr. Arrington, in the presence of Estus McGuffie, Jim Coker and Henry Smith, these three being deputy sheriffs of the county. It was further alleged that on hearing that the autopsy was to be performed the defendant requested an order of the court granting permission for him to be represented by his attorney and a competent physician to be selected by him at the autopsy, but that such order and permission were refused. It was then alleged that the attorney, and physician selected by the defendant made written request of the attorney who had been employed to assist the district attorney, in the absence of the latter, that they might be present at the autopsy, which request was denied; and that a similar request was made to the sheriff's office by the attorney for the defendant, which was also denied. It is alleged that the physician selected by the defendant started to the place where the autopsy was held, was turned back by a deputy sheriff; and the court was requested to direct Dr. Arrington and deputy sheriff to disclose to the defendant and his attorney what was found at the autopsy.

The court sustained this motion, directing the information to be disclosed. Whereupon a conference was held, and the attorney for the defendant brought Dr. Arrington before the court, and requested the court to instruct Dr. Arrington a witness for the state whose name

was on the indictment, to confer with defendant and his attorney, advising them as to the result of the autopsy performed upon the body of R. E. Moak on September 18, 1938; whereupon the court said: ''I realize the position of the doctor. They have certain rules of ethics involved; but under the circumstances, Doctor, the attorneys for the defendant are entitled to the result of your finding, and entitled to confer with you, and you will give them the benefit of the results of your finding.''

No evidence was introduced of a request to the court that the defendant might have a representative present at the autopsy, and of the refusal by the court of such a request. The allegations of the motion are at issue, without formal denial, and it devolves upon the movant to introduce proof in support of the motion.

No authorities are introduced bearing on the right of a defendant, where an autopsy is ordered by the court in a criminal prosecution against the defendant, nor has any citation been given, showing what rights the defendant may have in that regard. The question seems to be raised for the first time in this state.

Ordinarily an autopsy may be had only on direction of the court that a body be exhumed, but as a rule relatives assume control over such matters. It may be that in cases where an autopsy is performed without an order of the court, but with the consent of the relatives, with no notice to the defendant, nor opportunity for him to be heard, the findings would be admissible in evidence against the defendant,—that a statement as to the condition of the body, bearing on the matter involved in the prosecution, may be admitted in evidence, without the defendant having had opportunity to be heard, or to witness the autopsy. However, the proper course would appear to be, when requested by the defendant, to permit a competent physician to witness the autopsy as his representative, and also his attorney. That would appear to be fair and just, as the findings might be vital in turning the scale of evidence, or in disclosing evidence

which might have cogent force in the prosecution. But we do not think this record presents a case suitable for the submission of this question to the Court for decision. It probably would devolve upon the defendant to make formal application to the court for the privilege, with notice to the opposing parties. It would also appear to be the proper course when application is presented to the court by the state, that notice thereof should be given to the defendant, with opportunity to resist same, or to assert whatever rights the defendant and his counsel might deem proper.

The autopsy in the present case does not seem to have been prejudicial to the defendant's rights, because the doctor, before the autopsy, was of the opinion, from an examination of the body and the wounds, that the skull had been fractured, and that such fracture was the cause of death; whereas the autopsy disclosed that a cerebral hemorrhage had been the cause, produced either by physical violence, or by violent passion, accompanied by high blood pressure, such passion and excitement being calculated, under such circumstances, to produce a rupture of the blood vessels in the brain.

We are of the opinion that the evidence to the effect that the difficulty arose in regard to a former charge connected with an automobile theft, was admissible for the purpose of showing a state of mind, or motive. There was evidence not only that the defendant had so stated to the officers, but also that he had stated that he did not think Mr. Moak had treated him right in the matter of the automobile prosecution. That would tend to show a state of feeling which might result in violence on less provocation, or without provocation, for that matter; whereas, if no such state of feeling existed, violence might not have resulted from the situation existing at the time of the difficulty. It is evident from the record that no weapons were taken from the truck. None were found at the scene of the difficulty at the time or afterwards, and from the time the difficulty was observed by the four

witnesses to the fight, until it was over, the parties engaged in the struggle were several feet distant from the truck. The introduction of evidence to the effect that the defendant carried tools in the truck, while improper, under the facts of this case, when considered in connection with the evidence, does not appear to be of sufficient importance to warrant a reversal of the case.

Without going into the details of the voluminous record, we find by an examination of it that the verdict of manslaughter was justified by the evidence. The jury could infer from the evidence that the appellant began the difficulty; and even though the deceased was the aggressor, the act was unlawful, or a jury could so find; the killing being the unanticipated result flowing from the fight, in which fists and feet were used, but no weapons.

The case presents some difficulties, but from a careful review of all the facts, we think it highly probably that the offense was actually manslaughter. The defendant being convicted of manslaughter, and not of murder, all instructions and questions involving a charge of murder fade out on this appeal. In this case the jury, in finding the defendant guilty of manslaughter, made a strong recommendation to the court for mercy in imposing sentence, the verdict reading: "We, the jury, find the defendant guilty of manslaughter, and *especially ask the mercy of the court.*" The italicizing is in the verdict contained in the record, and is not the underscoring of the Court. This strongly indicates that while the jury thought the defendant should be punished, they thought he should receive a merciful sentence. The sentence of seventeen years here imposed is close to the maximum which may be imposed by law, the highest sentence being twenty years imprisonment in the penitentiary, where the killing is accompanied by aggravating circumstances not showing sufficient malice to warrant a verdict of murder, but approximating that condition, at least under some circumstances.

The line between murder and manslaughter is sometimes dim, and occasionally the jury finds a verdict for manslaughter when it should perhaps have been for murder. In this case the jury could not rightly have found a verdict of murder. The sentence for manslaughter ranges from twenty years in the penitentiary down to one day in jail, or a fine of $500. It should be controlled by the facts of the case—it should not be arbitrary. The sentence here appears to us to be excessive. However, in our practice, so far as we are informed or have found, no case has developed in which the Court has reversed solely because of the imposition of a severe sentence, where the punishment is within the limits fixed by the law applicable in such case. In regard to manslaughter there is an exceedingly wide discretion vested in the court, but it is a judicial discretion, a part of the judicial duty of the court in administering the law. If on reviewing the case here the Court can pass on the question at all—which is not now decided—there are facts in the record which might have influenced the trial judge in imposing the sentence, in opposition to the recommendation of the jury. The jury's recommendation, of course, is to be considered, and should have weighty force, but it is not controlling; and after a good deal of reflection, and some dissatisfaction with the sentence, on this record, we think the safe course would be to leave the correction of the severity of the sentence to the power which has been conferred upon the Governor, of the state.

We do not mean to say that cases may not arise in which it would be the duty of the Court to hold that a sentence (although within the limits of the law), when considered in connection with the facts, would be so excessive as to constitute a denial of due process of law, or a violation of the prohibition against cruel and unusual punishment. We prefer to wait until such a case so clearly appears as to make it the duty of the Court to decide the question of the power of the Court, on appeal,

to affirm the judgment of conviction, and remand the case for a re-sentence.

It follows from what we have said that the judgment must be affirmed.

Affirmed.